**This order is SIGNED.**

**Dated: January 18, 2019**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>GUILLERMINA SALAZAR,<br><br><br>Debtor. | Bankruptcy Number: 16-29028<br><br>Chapter 7 |
| EDUARDO VALADEZ,<br><br>Plaintiff,<br>vs.<br><br>GUILLERMINA SALAZAR,<br><br>Defendant. | Adversary Proceeding No. 17-02005<br><br>Hon. Kevin R. Anderson |

MEMORANDUM DECISION FINDING THAT DEFENDANT'S DEBT TO
PLAINTIFF IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(2)(A)

It's a familiar story – a person in financial need approaches an acquaintance with known resources for a loan. The transaction sours, resentments grow, memories fade, litigation ensues, and years later the court must decipher the facts and determine if the debtor is entitled to a discharge of the resultant debt.

Eduardo Valadez ("Valadez" or "Plaintiff") filed a Complaint against the debtor and defendant Guillermina Defendant ("Debtor" or "Defendant") seeking to have his debt determined to be nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[1] The Court held a trial on November 15 and 16, 2018. Stephen K. Christiansen and Alejandro Maynez represented the Plaintiff. Jeremy C. Sink and Nathan P. Williams represented the Defendant.[2]

On November 16, 2018 at the close of the Plaintiff's case in chief, the Defendant moved for judgment on the pleadings under Fed. R. Civ. P. 12(c), as made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b). The Court heard argument from counsel before issuing findings of fact and conclusions of law on the record. The Court accepted Plaintiff's withdrawal of the cause of action under § 523(a)(2)(A) regarding misrepresentations as to the value of the 1974 Stax Mobile Home and Defendant's medical status. The Court denied the motion on all other grounds.

After considering the evidence, including facts adduced from testimony or established by exhibits, and after assessing the credibility of the witnesses, considering the arguments of counsel, and conducting an independent review of the law, the Court is prepared to rule and now issues its findings of fact and conclusions of law.[3]

---

[1] All subsequent references to the United States Code are to Title 11 unless otherwise specified.

[2] Tessa Meyer Santiago of Lincoln Law Center, LLC represented the Defendant until July 17, 2018 when the Court permitted Ms. Santiago to withdraw as counsel. Jeremy C. Sink filed a notice of appearance on behalf of the Defendant on October 8, 2018 and Nathan P. Williams filed a notice of appearance on behalf of the Defendant on November 5, 2018.

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any of the conclusions of law herein are similarly deemed to be findings of fact, and they shall be equally binding as both.

## I.     INTRODUCTION

This case centers on alleged personal loans from Plaintiff to Defendant that started with a meeting in Plaintiff's home on October 21, 2014. Other than agreeing that a meeting took place, Plaintiff and Defendant disagree on virtually every other aspect of their dealings. Plaintiff testified that he first met Defendant on October 21, 2014, and that Plaintiff loaned Defendant $14,000 in cash in exchange for her promise that she would either repay the loan within four months or Plaintiff could take ownership of her 1974 Stax mobile home (the "Mobile Home"). In contrast, Defendant testified that she met Plaintiff as early as 2012 but denies receiving any cash from Plaintiff in October 2014. In answering whether the alleged debt should be discharged under §§ 523(a)(2)(A) and/or (a)(6), the Court is left to decide which version of the facts is closest to the truth and apply the law accordingly.

## II.     JURISDICTION, NOTICE, AND VENUE

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a)-(b) and 28 U.S.C. § 157(b). Plaintiff's request for a determination as to the dischargeability of a particular debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final order. Venue is appropriate in this District under 28 U.S.C. §§ 1408 and 1409, and notice of the trial was properly given to all parties in interest.

## III.     FINDINGS OF FACT

### 1.     The Parties

Defendant Salazar is the sole debtor in this case. Armando Garcia ("Garcia") is her non-filing spouse, and Dulce Rocha ("Rocha") is her daughter.

Plaintiff Valadez was in a car accident, for which he ultimately received $18,000 in cash. Plaintiff kept this cash at home with the intent of eventually building a home. While not a professional lender, Plaintiff made various loans to Defendant and her family.

### 2.   The Collateral

#### a.   *The Mobile Home*

Defendant purchased the Mobile Home (VIN: S10164X) for $30,000.[4] The title to the Mobile Home issued on April 21, 2009 listed Defendant as the owner with no lienholders.[5] The Mobile Home was located at 340 W 920 S TRLR 31, Provo, UT 84601-5833.[6] Defendant listed this address as her residence on her Chapter 7 bankruptcy petition.[7] Sometime around January 2017 Defendant and her family moved out of the Mobile Home after it was repossessed by another creditor.[8]

#### b.   *The 1992 Toyota Camry*

The certificate of title to a 1992 Toyota Camry (VIN: 4T1SK12E3NU070685) (the "Camry") issued on July 29, 2013 listed Defendant as the owner with no lienholders.[9] Defendant did not list the Camry as an asset on her bankruptcy schedules.[10] The Mobile Home and the Camry are collectively referred to as the "Vehicles."

### 3.   The $14,000 Loan on October 21, 2014.

#### a.   *The Conflicting Testimony of Plaintiff and Defendant*

On October 21, 2014 Defendant met with Plaintiff about a loan. As noted previously, Plaintiff and Defendant agree on little else about the transaction, including whether a loan occurred

---

[4] Plaintiff Ex. 16, p. 60. Although the Assignment of Title lists the sale price as $2,800, both the Juarezes and Defendant  testified that Defendant paid $30,000 for the Mobile Home.

[5] Plaintiff's Ex. 2, p. 3.

[6] Plaintiff's Ex. 16, p. 56.

[7] Case No. 16-29028, Docket No. 1.

[8] Defendant filed a change of address form with the Court on September 4, 2018. Case No. 17-2005, Docket No. 103. Dulce Rocha, Defendant's daughter, testified at the hearing on November 15, 2018 that she lived in the Mobile Home with Defendant for 10 years. Rocha testified that she and her family moved out of the Mobile Home one year after Defendant transferred the title to Rocha in January 2016.

[9] Plaintiff's Ex. 20.

[10] Case No. 16-29028, Docket No. 3.

at all. For frame of reference, the Court will summarize the testimony of both Defendant and Plaintiff.

Defendant testified that she first met Plaintiff in 2012 when she borrowed $3,000 from him. She testified that in 2013, she paid Plaintiff $5,500 in connection with the 2012 loan and that everything "went well." In October 2013, Defendant's husband, Garcia, borrowed $3,000 from Plaintiff's nephew, Cesar, who agreed to give Garcia a year to pay off the loan. Defendant testified that she gave Cesar the title to the Mobile Home in exchange for the $3,000 loan to Garcia, with the title to be returned upon repayment of the loan. Defendant testified that it was Cesar who asked that she go to Plaintiff's house on October 21, 2014 to "transfer" the $3,000 loan to Plaintiff. Defendant said that she agreed to the "transfer" because of Cesar's aggressive collection efforts. Defendant denies receiving any cash from Plaintiff on October 21, 2014, and she denies presenting the Mobile Home title to Plaintiff. She admits to signing a blank piece of paper, which she claims Plaintiff later filled in with loan terms. Defendant asserts that she started making payments to Plaintiff from November 2014 to August 2015 in the amount of $1,300 each, for a total of $11,700.

Plaintiff claims that he first met Defendant on October 21, 2014 at his home. He testified that he gave Defendant $14,000 in cash in exchange for a note to be repaid within four months and possession of title to the Mobile Home. He testified that Defendant also gave him a signed title to the Mobile Home with the understanding that Plaintiff could have the Mobile Home if Defendant did not repay the loan. Plaintiff testified that he never received any funds from Defendant in payment of the loan.

The Court generally found Plaintiff to be more credible than Defendant. Plaintiff produced witnesses who supported his principal version of events. While there were some disagreements among the witnesses, the thrust of all testimony corroborated Plaintiff's version of the facts as

testified at trial. These included witnesses Celia Velasquez, Laura Preciado, Cynthia Preciado, Ramiro Velasquez, Benito Juarez, Gabriela Juarez, Enrique Gonzalez, Martinez Francisco Martinez, and Salvador Lara – all of whom Plaintiff called in his case in chief. Some of these were independent witnesses with no bias. Some were family members with a potential for bias but with enough objective credibility and corroborating details to bolster Plaintiff's credibility. And at least one of them, Enrique Gonzalez, turned out to be a hostile witness. Plaintiff also called Defendant and her daughter Dulce Rocha during his case in chief and elicited testimony that confirmed and supported his version of the facts, notwithstanding that they were openly hostile. On cross-examination, Defendant did not raise substantial questions as to the credibility of Plaintiff's witnesses. Furthermore, Plaintiff had documentation – limited, unsophisticated, and incomplete though it was – that tended to support his version of events.

In contrast, Defendant was less credible. She gave testimony that was at odds with itself, with her testimony from her deposition,[11] and with her testimony at the hearing on her motion for a stalking injunction against Plaintiff.[12] Defendant also gave testimony that conflicted with other credible witnesses and with the documentary evidence in this case. Lastly, Defendant gave testimony that was, simply put, not credible. As one example of many, she testified under oath that she held the Camry title and never gave it to anyone despite testimony from both Plaintiff and Martinez to the contrary. Further, in direct conflict with her testimony, Plaintiff produced the original Camry title signed by Defendant.

Defendant also did not call witnesses to corroborate her version of events, despite their availability. Such potential witnesses include her husband Garcia, her daughter Rocha, her family

---

[11] Plaintiff's Ex. 24.
[12] Plaintiff's Ex. 14.

friend Enrique Gonzalez, and her husband's former co-worker Martinez. Further, as previously noted, she failed to substantially undermine through cross-examination the principal testimony given by Plaintiff's witnesses in his case in chief.

Other than herself, Defendant's only other witness was her attorney Dustin Hardy, whom the Court allowed to testify on the limited issue of a meeting with Defendant. Mr. Hardy testified that he met with Defendant and her husband in the first half of 2015, but he appropriately did not disclose the substance of the meeting.

In contrast, Defendant testified that she met with Hardy on September 3, 2015, which was the day before she transferred the Mobile Home to Gonzalez. Defendant further implied that the purpose of the meeting was to obtain legal advice on how to protect herself from Plaintiff and how to transfer the Mobile Home into Gonzalez's name. Defendant's testimony as to the timing of the meeting is not credible given that she attempted to place the meeting on the day before a key event in this case. Further, there was a lack of any corroborating documentation to support Defendant's version of when she met with Hardy. Lastly, Defendant's story is inconsistent with the fact that she obtained the duplicate title to the Mobile Home months before the meeting with Hardy. Even if Defendant did meet with Hardy, and even if Hardy gave her legal advice in furtherance of her scheme, Defendant cannot rely on an advice-of-counsel defense.

In sum, Defendant's conflicting testimony about the timing of the meeting was inherently biased and objectively unbelievable. Thus, it only further undermines Defendant's credibility, particularly when the she could have called other witness on this point.[13] Moreover, her implied suggestion that Hardy advised her to make a fraudulent transfer of the Mobile Home title to a

---

[13] For example, Defendant could have called Garcia, her husband, to testify about the date of the meeting as it was represented that he was also in attendance.

family friend for no consideration is not credible, as it would otherwise evidence a conspiracy with licensed legal counsel to perpetrate a fraud.

*a. Testimony of Plaintiff's Family Regarding the Meeting on October 21, 2014*

In addition to Plaintiff and Defendant's testimony, the Court received testimony from Laura Preciado (Plaintiff's daughter), Cynthia Preciado (Plaintiff's daughter),[14] Ramiro Velasquez (Plaintiff's son-in-law who is married to Cynthia),[15] and Celia Velasquez ("Plaintiff's wife" or "Celia")[16] about the meeting between Plaintiff and Defendant on October 21, 2014.

The testimony of the Plaintiff's family members supports his version of events on October 21, 2014. The family gathered at Plaintiff's home to make plans for Halloween. The family members – Laura, Cynthia, Ramiro, and Celia were in the kitchen and Plaintiff, Defendant, Garcia, and Cesar were in the living room. There is an opening between the kitchen and living room, so those in the kitchen could see and hear the transaction in the living room.

Laura Preciado testified that she was at her father's house on October 21, 2014. Although she did not know the purpose of the meeting, she saw Plaintiff, Defendant, Garcia, and Cesar at her father's house talking. At her father's request, Laura Preciado held and examined the title to the Mobile Home and showed her father and Defendant where to sign as buyer and seller. She indicated that she did not know the specifics of the transaction and assumed that her father was purchasing the Mobile Home. Therefore, she also told her father where to put the dollar amount for the sales price. Laura Preciado witnessed Defendant and Plaintiff sign the title.[17] Laura

---

[14] The Court received Cynthia Preciado's testimony through proffer.

[15] The Court received Ramiro Velasquez's testimony through proffer.

[16] The Court received Celia Velasquez's testimony through proffer. See Plaintiff's Ex. 22 (Deposition of Celia Velasquez).

[17] Plaintiff's Ex. 2.

Preciado testified that she saw her father stacking cash, and when he was finished, the parties talked for another 10 minutes before Defendant and her husband left the home.

The Court received a proffer from Plaintiff's daughter, Cynthia Preciado, and her husband, Ramiro Velasquez. Both of them were present at the meeting at Plaintiff's house on October 21, 2014 where they saw the meeting take place and the exchange of cash, but they did not know the details of the transaction between Plaintiff and Defendant.

The Court received the deposition of Celia Velasquez into evidence.[18] She was present in the home on October 21, 2014 and remembers the meeting between Plaintiff and Defendant. She saw Defendant take a piece of paper out of her purse which she believed to be the Mobile Home title. After Defendant, Garcia, and Cesar left the home, Plaintiff showed Celia Velasquez the Mobile Home title.

> b.    *Findings of Fact Regarding the Parties' Meeting on October 21, 2014*

Based upon the Court's credibility assessments, and after considering the testimony of Plaintiff's family, the Court makes the following findings of fact as to the October 21, 2014 meeting. Plaintiff's nephew Cesar knew Plaintiff had cash on hand from the 2012 car accident. On October 20, 2014 Cesar called Plaintiff and told him that Defendant needed to borrow money due to an illness. Plaintiff and Defendant then first met on October 21, 2014 at Plaintiff's home in connection with a family gathering. Present in the home at the time of the meeting were Plaintiff, Defendant, Garcia, Cesar, and five of Plaintiff's family members.[19] Plaintiff, Defendant, Cesar, and Garcia met in Plaintiff's living room where Defendant asked Plaintiff for a $14,000 loan arising from an illness.

---

[18] Plaintiff's Ex. 22.

[19] The family members present at the meeting were Ramiro Velasquez, Cynthia Preciado, Laura Preciado, Cynthia Velasquez, and another individual who is no longer a part of Eduardo's family.

Defendant brought to this meeting the original title to the Mobile Home that Defendant showed to Plaintiff. During the meeting, Defendant represented to Plaintiff that the Mobile Home was worth more than $14,000.

At the meeting, Defendant signed the original title to the Mobile Home as "Seller" and Plaintiff signed as "Buyer."[20] Plaintiff filled in the "Date of Sale" as "10/21/2014" and the "Sale Price" as "14,000."[21] Defendant then delivered possession of the title to Plaintiff, who considered the Mobile Home title to be collateral for the $14,000 loan. Plaintiff did not intend to purchase the Mobile Home, but rather he viewed the Mobile Home as security for his loan to Defendant. At trial, the Court examined the original of the Mobile Home title, which is still in Plaintiff's possession, and found it be an authentic original of Plaintiff's Exhibit 2.

After the parties signed the Mobile Home title, Plaintiff went to his bedroom and returned with $14,000 in cash. Plaintiff handed Defendant the $14,000 in cash in $100 bills separated into packets of $1,000.

The parties then agreed that Defendant would pay back the $14,000 loan within four months of the October 21, 2014 meeting or Plaintiff could transfer title to the Mobile Home into his name. The terms of the agreement are evidenced by a hand-written note prepared by Plaintiff during the meeting (the "Note"). The Note was signed by both parties on October 21, 2014.[22] The English translation of the Note reads in pertinent part:

---

[20] Plaintiff's Ex. 2, p. 4.

[21] *Id.*

[22] Plaintiff's Ex. 1, p. 2.

Signed upon Receipt

EDUARDO VALADEZ OCT/21//2014

Shall be had as the remedy a signed title to the Mobile Home #UT9149649 by the interested party who received $14,000 dollars. To be paid within 4 months or I shall keep the Mobile Home if said amount has not been paid.

Signature [by Defendant][23]

As noted above, there was conflicting testimony about the repayment of the $14,000 loan. Other than her testimony, Defendant offered no proof of repayment. Based on the testimony and other evidence, the Court accepts as fact that Plaintiff did not receive any repayment on this loan.

**4.      Plaintiff's Loan of $1,000 to Defendant's Husband**

On or before December 15, 2014, Plaintiff advanced sums totaling $1,000 to Defendant's husband Garcia in two separate installments, one of $300 and the other of $700. Before advancing the $700 loan, Plaintiff spoke by telephone to Defendant, who promised that the funds loaned to Garcia would be backed by the Mobile Home. Defendant further promised to secure Garcia's loan by signing and delivering to Plaintiff the original title to the Camry. Plaintiff understood he could transfer the Camry into his name if Garcia did not repay the funds as agreed. Defendant signed the Camry title as "Seller" and Plaintiff signed the title as "Buyer."[24] The title lists the "Date of Sale" as 12/15/2014 with a "Sale Price" of $700. At trial, the Court examined the original of the Camry title, which is still in Plaintiff's possession, and found it be an authentic original of Plaintiff's Exhibit 20.

In connection with Garcia's loans, Plaintiff wrote the following addition to the Note:[25]

---

[23] Plaintiff's Ex. 1, p. 2.
[24] Plaintiff's Ex. 20.
[25] Plaintiff's Ex. 1.

> 15/DEC/2014
>
> An additional 1000 dollars shall be added to the 14,000 dollar account this
> day 15/DIC/2014
>
> Signature [by Defendant][26]

Again, there was conflicting testimony about the repayment of the $1,000 loan. Other than her testimony, Defendant offered no proof of repayment. Garcia did not testify. In January 2018, Plaintiff obtained a small claims judgment against Garcia in the amount of $1,408.36 with 3.760% interest until paid.[27] Therefore, the Court finds that Plaintiff did not receive any payments on this loan.

### 5.    Plaintiff's Loans to Defendant's Daughter

Plaintiff testified that he loaned money to Defendant's daughter, Dulce Rocha. The testimony was unclear as to the amount or the date of Plaintiff's loan(s) to Rocha. In January of 2015, Plaintiff  made the following hand-written addition to the Note:

> Plus $1300 of her daughter Dulce Del Dia
> 23/January/2015

Significantly, this addition to the Note is not accompanied by anyone's signature. As explained below, the Court thus finds that Defendant is not legally liable for Rocha's loans, and will not consider them as a debt for purposes of this adversary proceeding.

### 6.    Defendant Obtains a Duplicate Title to the Mobile Home While Plaintiff Held the Original Title

On April 21, 2015, Defendant went to the Utah Division of Motor Vehicles (the "DMV") and obtained a duplicate title to the Mobile Home. In completing the application, she made the following representation under oath: "I certify that the original certificate of title for this vehicle

---

[26] *Id.*

[27] Plaintiff's Ex. 18.

has been lost, stolen, mutilated, or made illegible, and has not been endorsed and delivered to a transferee, pledged as collateral, or delivered to a lending institution."[28] Defendant never informed Plaintiff of the duplicate title.

On September 4, 2015, Defendant used the duplicate title to transfer the Mobile Home to Enrique Gonzalez ("Gonzalez").[29] Gonzalez testified that he approached Defendant at church because he saw her crying and wanted to help. Defendant told Gonzalez she had cancer and asked if she could put the Mobile Home in his name to protect it. Gonzalez agreed, and they went to the DMV where Defendant used the duplicate title to transfer the Mobile Home to Gonzalez. Defendant did not receive consideration for this transfer.[30] Some days later, Gonzalez received the Mobile Home's title in the mail, but he did not open the envelope.

Even though the Note said that the $14,000 loan and the $1,000 loan were to be paid within four months of October 21, 2014, it was not until early September 2015 that Plaintiff went to the DMV with the original title to transfer the Mobile Home into his name. However, the DMV could not issue a title in his name because Defendant had used the duplicate title to transfer the Mobile Home to Gonzalez.

Sometime in early January 2016, Defendant went to Gonzalez's home, and told him that her cancer had improved and asked for a return of the Mobile Home. Gonzalez signed the transfer section and gave it to Defendant.[31] The conveyance and re-conveyance of the Mobile Home with Gonzalez involved no exchange of value.

---

[28] Plaintiff's Ex. 16, p. 64.
[29] Plaintiff's Ex. 16, pp. 66-73.
[30] Plaintiff's Ex. 16, p. 68.
[31] Plaintiff's Ex. 16, pp. 74-81.

On January 6, 2016, Defendant went to the DMV, this time to transfer the Mobile Home's title into Rocha's name.[32] Rocha gave no value for the Mobile Home, and Defendant and Rocha continued living in the Mobile Home after the transfer.[33] In January 2017, Defendant's family moved out of the Mobile Home because, as explained below, it was repossessed by another of Defendant's creditors.

### 7.    Juan Martinez Loans to Defendant

Defendant's husband, Garcia, worked for Juan Martinez ("Martinez"). In October 2015, Garcia and Defendant asked Martinez for money. Martinez entered into three personal loan contracts with Defendant.[34] All of the loans were made in cash. The first loan occurred on October 27, 2015 in the amount of $1,300. Martinez testified that Defendant gave him the title to the Camry to secure the $1,300 loan. The second loan occurred on October 28, 2015 in the amount of $1,300 secured by a 2002 GMC Yukon. The third loan occurred on January 12, 2016 in the amount of $5,000 secured by the Mobile Home. On July 14, 2016, the DMV issued a new title to the Mobile Home with Martinez as a lienholder.[35]

Despite the Mobile Home being titled in Rocha's name, Rocha was not involved in the loan transaction with Martinez. Defendant defaulted on all three loans, and Martinez sued Defendant in a Utah state court for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.[36] On January 26, 2017, Martinez repossessed the Mobile

---

[32] Plaintiff's Ex. 16, p. 76.

[33] Plaintiff's Ex. 16, p. 76.

[34] Plaintiff's Ex. 17.

[35] Plaintiff's Ex 16.

[36] Plaintiff's Ex. 17.

Home, and Defendant and her family had to move out.[37] When Martinez tried to repossess the Camry, Defendant told him it had been "junked."

Neither the application for duplicate title to the Camry nor the title given by Defendant to Martinez was introduced into evidence. However, based on the testimony of Martinez, the fact that Plaintiff possessed the original title to the Camry, and that Defendant obtained a duplicate title to the Mobile Home, the Court can only conclude that Defendant likewise obtained a duplicate title to the Camry by submitting an application to the DMV.

**8.     Defendant's Police Report and Civil Stalking Proceedings Against Plaintiff**

Beginning in September 2015, Plaintiff and Defendant exchanged text messages about repayment of the loans.[38] Plaintiff testified he was on vacation in California when he started receiving text messages from Defendant. He thought Defendant was trying to make him mad or was "playing" with him. Defendant testified that she felt threatened by Plaintiff's text messages.

On September 3, 2015, Cesar, a relative of Plaintiff, visited Defendant at the Mobile Home, and she called the police.[39] The resulting Police Report indicates that the officer investigated a civil incident involving a "loan shark" who "goes by the name of Cesar."[40] The testimony was unclear, but the Court understands that Cesar was collecting his own debt from Defendant and not Plaintiff's Note.

On October 1, 2015, Defendant filed a request for civil stalking injunction against Plaintiff with the Fourth District Court, State of Utah.[41] In support thereof, Defendant cited to the Police Report and included a copy of the September 2015 text messages exchanged with Plaintiff. The

---

[37] Plaintiff's Ex. 16, p. 100-104.
[38] Plaintiff's Exs. 3, 6.
[39] Plaintiff's Ex. 5.
[40] *Id.*
[41] Plaintiff's Ex. 4.

Fourth District Court issued a temporary civil stalking injunction on an *ex parte* basis on October 8, 2015.[42] The injunction prohibited Plaintiff from contacting Defendant and enjoined him from approaching the Camry or the Mobile Home.[43]

On October 8, 2015 Plaintiff retained an attorney to defend himself in the civil stalking matter.[44] On July 26, 2016, the state court held an evidentiary hearing and dismissed the temporary stalking injunction.[45] The court also denied the request for a permanent stalking injunction, finding that Defendant's distress and fear came from Plaintiff's efforts to collect a debt and not from threats of physical or emotional harm.[46]

### 9.       The Bankruptcy Proceedings

On October 12, 2016, Defendant filed a Chapter 7 bankruptcy petition.[47] Her bankruptcy schedules and statements were signed under penalty of perjury.[48] Schedule D lists Plaintiff as a creditor with a claim for $28,000 secured by the Mobile Home.[49] The debt origination date is 10/2014, and the lien is identified as a non-purchase money security. This is consistent with Plaintiff's testimony regarding the loans.

Schedule D also lists Juan Martinez as holding a secured claim against the Mobile Home in the amount of $2,421.54. The origination date is 01/12/2016, and the lien is identified as a purchase money security.

---

[42] Plaintiff's Exs. 8, 13.

[43] *Id.*

[44] Plaintiff's Ex. 9. Eduardo signed a retainer agreement with attorney Alex Maynez on October 8, 2015.

[45] Plaintiff's Ex. 13, p. 5.

[46] Plaintiff's Ex. 14 - Audio from civil stalking injunction hearing held on May 26, 2016 and July 26, 2016 in Case No. 150401538.

[47] Case No. 16-29028, Docket No. 1.

[48] Case No. 16-29028, Docket No. 3; Plaintiff's Ex. 19.

[49] Case No. 16-29028, Docket No. 3 at p. 11 of 47; Plaintiff's Ex. 19.

On January 18, 2017, Plaintiff filed this adversary proceeding.[50] The Chapter 7 Trustee

filed a report of no distribution on February 28, 2017, and the Court closed the main bankruptcy

case on April 4, 2017.[51]

Plaintiff took Defendant's deposition on March 26, 2018.[52] On March 27, 2018, Defendant

amended Schedules D and E/F to remove Plaintiff as a secured creditor and list him on Schedule

E/F as an unsecured creditor.[53] The amendment indicates that Plaintiff's claim is disputed in the

amount of $3,000 with the explanation that "Debtor believes amount has been paid." Given the

timing of these amendments and the issues in this adversary proceeding, the Court finds that

Defendant's amendment was not made in a good faith effort to accurately list her debts but rather

to bolster her defenses in this adversary proceeding.

## IV. CONCLUSIONS OF LAW & ANALYSIS

Plaintiff asks the Court to rule that his claims against Defendant are nondischargeable

under: (1) § 523(a)(2)(A) for false representation; (2) § 523(a)(2)(A) for actual fraud; and/or (3)

§ 523(a)(6) for willful and malicious injury for conversion and/or abuse of process.

"Dischargeability actions require a two-part analysis; first, the bankruptcy court must determine

the validity of the debt under applicable law (the claim on the debt); and second, the bankruptcy

court must determine the dischargeability of that debt under § 523 (the dischargeability claim)."[54]

---

[50] Adv. Pro. 17-2005.

[51] Case No. 16, 29028, Docket Text Entries dated 02/28/2017 and 04/04/2017.

[52] Plaintiff's Ex. 24.

[53] Case No. 16-29028, Docket No. 17.

[54] *In re Thompson*, 555 B.R. 1, 8 (10th Cir. B.A.P. 2016).

1.      **Does Defendant Owe Plaintiff a Debt?**

Defendant denies owing any money to Plaintiff. The Court looks to applicable non-bankruptcy law to determine the validity of the debt,[55] which is typically governed by state law.[56] As noted by the Tenth Circuit Bankruptcy Appellate Panel:

> "Debt" is defined in the Code as "liability on a claim," and "claim" is defined in turn as a "right to payment." For purposes of § 523(a)(2)(A), "debt" means liability on "an enforceable obligation." Whether a debt exists is determined by looking to applicable law, frequently state law. Section 523(a)(2)(A)'s use of the term "*any* debt" (emphasis added) indicates that "debt" as used in § 523(a)(2)(A) is not restricted to a debt established under any particular theory of recovery. To establish the validity of the debt under § 523(a)(2)(A), the claimant must establish that the debtor is liable on an enforceable obligation under applicable law, nothing more nor less.[57]

Thus, the Court looks to Utah law to determine whether Defendant is liable to Plaintiff pursuant to an enforceable obligation.

Plaintiff asserts that he has an enforceable loan contract with Defendant, and that Defendant has breached its repayment terms. In Utah, a breach of contract action requires proof of four elements: "(1) the existence of a valid contract; (2) performance by the party seeking recovery; (3) breach of contract by the other party; and (4) damages."[58]

The existence of a valid contract requires a meeting of the minds between the parties.[59] Defendant alleges that such a meeting of the minds never existed. "To determine whether there has been a 'meeting of the minds,' a court should consider 'all preliminary negotiations, offers,

---

[55] *Thompson*, 555 B.R. at 8.

[56] *Id.*

[57] *Id.* at 8-9 (citations omitted).

[58] *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001), *abrogated on other grounds* by *Gillett v. Price*, 135 P.3d 861 (Utah 2006).

[59] *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) ("It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract.").

and counteroffers and interpret the various expressions of the parties [to determine] whether the parties reached agreement on complete and definite terms.'"[60]

Utah Courts traditionally refer to offer and acceptance as the "tools for determining whether there has been a 'meeting of the minds.'"[61] "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it," and an acceptance "must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer."[62]

At the meeting on October 21, 2014, the evidence establishes that Plaintiff agreed to loan Defendant $14,000 to be repaid within four months or Plaintiff could transfer title to the Mobile Home into his name. Later, Plaintiff agreed to loan $1,000 to Defendant's husband, Garcia, on the same terms but with the Camry serving as additional security. Proof of the offer and acceptance to these terms is the testimony of Plaintiff and his corroborating witnesses coupled with the hand-written Note and the titles to the Vehicles signed by Plaintiff and Defendant and held by Plaintiff.[63]

Therefore, the Court finds that pursuant to the Note, Defendant owed Plaintiff the principal sum of $15,000. The Court has found that Defendant did not make any payments on the Note. Thus, Plaintiff has a valid claim against Defendant for a breach of the Note.

As to Plaintiff's loans to Defendant's daughter, Dulce Rocha, the Court has found that there is not a signature accompanying the hand-written addition of these loans to the Note. Further, the Court finds insufficient evidence to establish that Defendant was pledging the Vehicles as security

---

[60] *Lebrecht v. Deep Blue Pools & Spas, Inc.*, 374 P.3d 1064, 1069 (Utah Ct. App. 2016) (citation omitted).

[61] *Houwelling's Nurseries Oxnard, Inc. v. Robertson*, 276 F. Supp. 3d 1239, 1246 (D. Utah 2017) (citation omitted).

[62] *Houwelling's Nurseries Oxnard, Inc.*, 276 F. Supp. 3d at 1246-47 (citation omitted).

[63] Plaintiff's Ex. 1.

for Rocha's loans. Thus, the Court finds that Defendant is not liable for Rocha's loans and will not include them as a debt for purposes of this adversary proceeding.

### 2.    Did Defendant Make False Representations Under § 523(a)(2)(A)?

Section 523(a)(2)(A) states in relevant part: "(a) [a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . (2) for money . . . to the extent obtained by— (A) false pretenses, a false representation, or actual fraud . . . ."[64] Section 523 actions carry a heavy burden because exceptions to discharge are to be narrowly construed, and any doubt as to a debtor's culpability and intent is to be resolved in the debtor's favor.[65]

To except a debt from discharge for false representation, a "creditor must prove the following elements: (1) [t]he debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss."[66]

### a.  Defendant's Representations to Plaintiff

The Court has already found, based on the testimony, the Note, and the title to the Mobile Home, that Defendant represented to Plaintiff that she would repay the $14,000 loan within four months or Plaintiff could transfer title to the Mobile Home into his name. Based on the testimony, the Camry title, and the signed addition to the Note, the Court has also found that Defendant represented that the $1,000 loan to her husband Garcia would likewise be repaid within four months or Plaintiff could transfer title to the Mobile Home and the Camry into his name.

---

[64] 11 U.S.C. § 523(a)(2)(A).

[65] *See DSC Nat'l Props., LLC v. Johnson* (*In re Johnson*), 477 B.R. 156, 168 (10th Cir. B.A.P. 2012) (citation omitted).

[66] *Id.* at 169.

### b.   *Justifiable Reliance*

Justifiable reliance is an intermediate, subjective standard positioned between "reasonable" reliance and "mere" reliance.[67] Justifiable reliance means that "[a] person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'"[68] For purposes of § 523(a)(2)(A) actions, a creditor's reliance is unjustified "only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."[69]

Turning to the facts, at the meeting in October 2014, Defendant presented Plaintiff with the original title to the Mobile Home showing Defendant as its owner and with no lienholders.[70] Defendant then signed the "Assignment of Title By Registered Owner" section of title and delivered its possession to Plaintiff. Defendant also signed the Note with its representation that she would repay the $14,000 loan in four months or Plaintiff could keep the Mobile Home. Based on these actions, the Court finds Plaintiff was justified in believing that Defendant intended to repay the $14,000 loan within four months and that she intended Plaintiff's possession of the Mobile Home title to serve as security for the loan in the event Defendant did not repay the loan.

In addition, it was justifiable for Plaintiff to rely on Defendant's representation that he could keep the Camry if she or her husband did not repay the $1,000 loan. As with the Mobile Home, Defendant presented the Camry's original title to Plaintiff showing Defendant as the titled

---

[67] *Field v. Mans*, 516 U.S. 59, 72-73 (1995).

[68] *Id.* at 71 (quoting the Restatement (Second) of Torts (1976) § 541, cmt. a (1976)).

[69] *Id.* (citation omitted).

[70] Plaintiff's Ex. 2.

owner with no lienholder.[71] Likewise, Defendant signed the transfer section of the title and gave it to Plaintiff. Finally, Defendant signed the addendum to the Note stating that an additional $1,000 would be added to the $14,000 loan. Thus, the Court finds that Plaintiff justifiably relied on Defendant's representations that he could keep the Camry if she did not repay the $1,000 loan.

     *c.*    *Intent to Deceive*

Having found a representation and justifiable reliance, the dispositive issue is whether at the time of the representations, Defendant did not intend to make good on them. The Tenth Circuit has limited the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong."[72] The debtor must have acted with the subjective intent to deceive the creditor.[73] While a debtor's "reckless disregard for the truth" may be evidence of an intent to deceive, granting relief under § 523(a)(2)(A) based on such evidence should only be made "in very narrow circumstances."[74]

When analyzing a debtor's subjective intent to deceive, the court may draw inferences "from the totality of the circumstances."[75] "Making a representation to a creditor with a 'reckless disregard for the truth' may be some evidence of an intent to deceive the creditor."[76] "However, a finding of 'reckless disregard for the truth' translates into subjective intent to deceive (i.e., scienter) only in very narrow circumstances."[77] In addition, "[c]arelessness in making a statement that turns

---

[71] Plaintiff's Ex. 20.

[72] *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991); *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. B.A.P. 1998); *N. N.M. Orthopaedic Ctr., P.C. v. Auge (In re Auge)*, No. 14-01057 t, 2015 Bankr. LEXIS 1398, 2015 WL 1867894 (Bankr. D. N.M. Apr. 22, 2015).

[73] *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (10th Cir. B.A.P. 2005), *aff'd, First Nat'l Bank v. Cribbs (In re Cribbs)*, No. 05–6225, 2006 U.S. App. LEXIS 17090, 2006 WL 1875366 (10th Cir. July 7, 2006). *See also Kukuk*, 225 B.R. at 786-88.

[74] *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. B.A.P. 2012) (citation omitted).

[75] *Id.* (citing *In re Cribbs*, 327 B.R. at 673).

[76] *Id.*

[77] *Id.* (citing *In re Kukuk*, 225 B.R. at 787).

out to be untrue constitutes negligence, and a negligent misrepresentation is not necessarily fraudulent."[78] Further, a court can examine a "debtor's conduct at the time of the representations" and "subsequent conduct" to determine the debtor's intent or state of mind.[79] Finally, the Court finds the following factors from Section 526 of the Restatement (Second) of Torts to be relevant and helpful:

> A misrepresentation is fraudulent if the maker --
>
> (a) knows or believes that the matter is not as he represents it to be,
>
> (b) does not have the confidence in the accuracy of his representation that he states or implies, or
>
> (c) knows that he does not have the basis for his representation that he states or implies.[80]

Applying this standard, the Court cannot find that at the time of the loans, Defendant intended to deceive Plaintiff. Plaintiff did not put on testimony or other evidence establishing that at the time of the loans, Defendant did not intend to repay. The Court also finds that because Defendant delivered to Plaintiff the executed titles to the Mobile Home and the Camry, it suggests, at least at that time, that she intended the Vehicles to serve as security for the loans consistent with her representations. It would be a different matter if Defendant promised to deliver the titles and then never did so. For these reasons, Plaintiff's nondischargeability action based on the allegation of Defendant's misrepresentations must fail.

---

[78] *Id.* at 170.

[79] *Groetken v. Davis* (*In re Davis*), 246 B.R. 646, 652 (10th Cir. B.A.P. 2000) ("A debtor does not make a false representation under § 523(a)(2)(A) merely by presenting a check for payment which later bounces. Rather, the creditor must show that the debtor was guilty of misrepresentation with intent to defraud in direct connection with issuance of the check. A false representation can be established if the debtor did not intend to pay the creditor when the check was issued and knew that the check would bounce.") (citations omitted), *aff'd in part, vacated, and remanded in part on other grounds*, 35 Fed. App'x. 826 (10th Cir. 2002).

[80] *In re Johnson*, 477 B.R. at 170 (quoting the Restatement (Second) of Torts § 526 (1976)).

### 3.     Did Defendant Engage in Actual Fraud Under § 523(a)(2)(A)?

To except a debt from discharge "based on actual fraud, the creditor must show: (a) the debtor committed actual fraud; (b) the debtor obtained money, property, services, or credit by the actual fraud; and (c) the debt arises from the actual fraud."[81] Put simply, actual fraud is "anything that counts as 'fraud' and is done with wrongful intent."[82] However, a misrepresentation is not required.[83] Actual fraud can be found "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[84]

In a 2016 decision, *Husky International Electronics, Inc. v. Ritz*,[85] the Supreme Court expanded the definition of "actual fraud" in the context of § 523(a)(2)(A) to include fraud that does not involve a misrepresentation, such as a fraudulent conveyance scheme.[86] The Supreme Court noted that "a debtor's transfer of assets that . . . impairs a creditor's ability to collect the debt" constitutes fraud.[87] The Court also noted that "the term 'fraud' has, since the beginnings of bankruptcy practice, been used to describe asset transfers that, like [the defendant's] scheme, impair a creditor's ability to collect a debt."[88]

Plaintiff's claim for nondischargeability based on actual fraud is akin to the fraudulent conveyance described in *Husky* that was intended to impair a creditor's ability to collect a debt. Specifically, despite Defendant's representations and her signature and delivery of the original titles to Plaintiff, Defendant subsequently obtained duplicate titles and delivered them to third

---

[81] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 10 (10th Cir. B.A.P. 2016).

[82] *Husky Intern. Elec., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

[83] *In re Thompson*, 555 B.R. at 11 (citing *Ritz*, 136 S. Ct. at 1587).

[84] *Id.* at 11 (citing *In re Vickery*, 488 B.R. 680, 690 (10th Cir. B.A.P. 2013) (quoting *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (6th Cir. B.A.P. 2001))).

[85] 136 S. Ct. 1581 (2016).

[86] *Id.*

[87] *Id.* at 1586-87.

[88] *Id.* at 1584.

parties as collateral for other loans. In obtaining the duplicate titles, Defendant made false and fraudulent representations to the DMV that the titles to the Vehicles had "been lost, stolen, mutilated, or made illegible, and has not been endorsed and delivered to a transferee, [or] pledged as collateral."[89] The circumstances of Defendant's actions indicate that she obtained the duplicate titles and used them to convey title to the Vehicles to third parties as part of an intentional scheme to deprive Plaintiff of the benefit of his bargain. These actions include (1) conveying the fraudulently obtained duplicate title to the Mobile Home to fellow church member Gonzalez for no consideration; (2) causing Gonzalez to convey the Mobile Home to her daughter Rocha, again for no consideration; (3) then pledging the Mobile Home as security for the Martinez loan to Defendant; and (4) delivering a duplicate title to the Camry to Martinez when Plaintiff concurrently held the original Camry title.

The timing of Defendant's transfer of the Mobile Home to Gonzalez is further evidence of her fraudulent intent. This transfer occurred on September 4, 2015, which is the same time that Plaintiff and Defendant exchanged text messages regarding the repayment of the loans.[90] It is clear to the Court that Defendant transferred the Mobile Home to Gonzalez to impair Plaintiff's ability to collect on the Note. In January 2016, Defendant had Gonzalez reconvey the Mobile Home back into her name, and then she quickly transferred the Mobile Home to her daughter Rocha. This was done so Defendant could then immediately pledge the Mobile Home to Martinez as collateral for the loan she received from him. Defendant took similar actions with respect to the Camry, in that she first gave the Camry title to Plaintiff, but then obtained a duplicate title and repledged the Camry as security for the Martinez loan.

---

[89] See applications for duplicate title at Plaintiff's Ex. 16
[90] Plaintiff's Ex. 3, p. 5.

The Court does not believe Defendant's explanations as to why she obtained the duplicate titles and delivered them to other persons after giving the titles to Plaintiff. As noted above, Defendant attempted to suggest that her attorney, Mr. Hardy, advised her to obtain the duplicate title and transfer the Mobile Home to a third party to protect it from Plaintiff. Defendant also testified that she obtained the duplicate because Plaintiff wanted a more recent title to the Mobile Home. However, at her deposition, Defendant could recall very little about her request for a duplicate title to the Mobile Home.[91] None of Defendant's explanations or justifications are credible.

The Court thus finds that Defendant fraudulently obtained duplicate titles to the Mobile Home and Camry as part of an intentional "scheme to deprive or cheat [Plaintiff] of property or a legal right."[92] Therefore, the Court finds that Defendant's debt to Plaintiff is nondischargeable for actual fraud under § 523(a)(2)(A).

### 4.    Willful and Malicious Injury - § 523(a)(6)

Plaintiff's complaint seeks a denial of discharge under § 523(a)(6) for willful and malicious conversion of the titles to the Vehicles and for abuse of process regarding the stalking injunction. Section 523(a)(6) excepts from discharge a debt arising from the "willful and malicious injury by the debtor to another entity or to the property of another entity."[93] To be non-dischargeable under § 523(a)(6) "requires that the debtor's actions be *both* willful and malicious."[94] The "willful" element requires both an intentional act and an intended harm – an intentional act that leads to

---

[91] Plaintiff's Ex. 24, p. 38-41.

[92] *In re Thompson*, 555 B.R. at 11 (citing *In re Vickery*, 488 B.R. 680, 690 (B.A.P. 10th Cir. 2013) (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001))).

[93] 11 U.S.C. § 523(a)(6).

[94] *Utah Behavior Servs. v. Bringhurst (In re Bringhurst)*, 569 B.R. 814, 823 (Bankr. D. Utah 2017) (citations omitted).

unintended harm is not sufficient.[95] The "malicious" element requires an intentional, wrongful act, done without justification or excuse.[96]

It is clear that Defendant intended to obtain the duplicate titles and the stalking injunction, but there was insufficient evidence for the Court to find that she intended these actions to specifically and maliciously harm Plaintiff. Rather, the evidence suggests her intent was to avoid repaying Plaintiff, to get Plaintiff to stop contacting her about repayment of the loans, and to use the vehicle titles to obtain additional loans from other persons. Thus, the Court finds that Defendant did not willfully and maliciously harm Plaintiff for purposes of § 523(a)(6). Nonetheless, the Court will address the specific allegations of conversion and abuse of process.

### a.  Conversion

Plaintiff asserts that Defendant's debt to him should not be discharged because she willfully and maliciously converted the Mobile Home and the Camry. In Utah "[t]o prove conversion, a party must establish 'an act of willful interference with property, done without lawful justification, by which the person entitled to property is deprived of its use and possession,' and that the party 'is entitled to immediate possession of the property at the time of the alleged conversion.'"[97] The Restatement of Torts defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly

---

[95] *Id.* at 823 (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).

[96] *Penix v. Parra (In re Parra)*, 483 B.R. 752 (Bankr. D.N.M. 2012) (The holding in *Parra* synthesizes the Tenth Circuit's ruling in *Panalis v. Moore (In re Moore)*, 357 F.3d 1125 (10th Cir. 2004) with the Supreme Court's holding in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)).

[97] *Jones & Trevor Mktg., Inc. v. Lowry*, 233 P.3d 538 (Utah Ct. App. 2010), *aff'd* 284 P.3d 630 (Utah) (quoting *Bennett v. Huish*, 155 P.3d 917 (Utah Ct. App. 2007) (emphasis, citations, and internal quotation marks omitted)).

be required to pay the other the full value of the chattel."[98] Chattels are tangible, personal property.[99]

The Court is not persuaded that Defendant's conduct with respect to the Mobile Home and the Camry amounted to conversion. Plaintiff only held the titles, representing an equitable interest in the Vehicles that would not become choate until a new title was issued in his name. Thus, Defendant's actions regarding the duplicate titles did not involve an interference with a tangible, personal property interest of Plaintiff. Certainly, if Defendant had interfered with Plaintiff's use of the Vehicles after title was in his name, the outcome would be different. Thus, the Court finds that Defendant did not commit a conversion for purposes of § 523(a)(6).

### b.    Abuse of Process

As an additional form of willful and malicious injury, Plaintiff cites to his claim against Defendant for abuse of process. Plaintiff claims that Defendant instituted civil stalking injunction proceedings against Plaintiff for an ulterior purpose – to deter him from collecting on the loans to Defendant. Plaintiff claims that Defendant's application for a civil stalking injunction falsely stated that she had been making payments to him and attached Police Report #15PR22934 referring to an individual who had harassed her at her home and threatened her with a gun.

An abuse of process claim under Utah state law requires "'an ulterior purpose' and 'a wilful act in the use of the process not proper in the regular conduct of the proceeding.'"[100] To satisfy the "wilful" requirement, "a party must point to conduct independent of the legal process itself that corroborates the alleged improper purpose."[101] Importantly, "even if the goals of the lawsuit are

---

[98] Restatement (Second) of Torts § 222A (1979).

[99] Id.

[100] Hatch v. Davis, 147 P.3d 383 (Utah 2006) (quoting William Prosser, Law of Torts § 121, at 857 (4th ed. 1971)) (additional citation and quotations omitted).

[101] Id. at 389.

nefarious and improper" that may not be an abuse of process claim if there is no "objective proof of the improper purpose in the form of an independent act."[102]

First, Plaintiff did not meet his burden to establish that Defendant sought the civil stalking injunction for an improper purpose. Defendant testified that she filed the request for a civil stalking injunction on October 1, 2015 because she felt threatened by her interactions with Plaintiff and his text messages. There was some basis for Defendant's concern. As noted by Judge Laycock at the July 26, 2016 evidentiary hearing, Plaintiff's text message on September 11, 2015 could be construed as a threat: "[B]ecause you know that in order for me to do something, I just need to move one finger but I do not like to use threats."[103] Thus, Defendant's request for an injunction was not patently frivolous. The Utah state court ultimately held a two-hour evidentiary hearing on Defendant's request for a stalking injunction.[104] Judge Laycock made detailed findings of fact and conclusions of law on the record before she dismissed the temporary injunction and denied Defendant's request for a permanent injunction.[105] Judge Laycock reasoned that Plaintiff's conduct related to the collection of a debt and did not involve threats of physical or emotional harm. Thus, they did not rise to the level of civil stalking as defined by the Utah Code. Further, even if Plaintiff had established an ulterior purpose, he did not establish the "willful" requirement of an abuse of process claim.

For these reasons, the Court cannot find that Plaintiff established an abuse of process sufficient to support a ruling of nondischargeability under § 523(a)(6).

---

[102] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1104 (10th Cir. 2009).

[103] Plaintiff's Ex. 3, p. 12.

[104] Plaintiff's Ex. 13.

[105] Plaintiff's Ex. 13 (docket); 14 (audio from Civil Stalking Injunction hearing).

5.    **Damages**

Pursuant to his claim for nondischargeability under § 523(a)(2)(A) Plaintiff requests compensatory damages between $16,500 to $35,700 and punitive damages in an equal amount, together with prejudgment interest of 10% on the compensatory damages from February 21, 2015 to the date of entry of judgment.

         *a.  Compensatory Damages*

"As a general rule, legal damages serve the important purpose of compensating an injured party for actual injury sustained, so that she may be restored, as nearly as possible, to the position she was in prior to the injury."[106] Based on the Court's factual findings, it awards Plaintiff compensatory damages in the principal amount of $15,000. This constitutes $14,000 in actual damages for Defendant's breach of the first loan contract on October 21, 2014 and $1,000 in actual damages for Defendant's breach of second loan contract on December 15, 2014.

Plaintiff did not prove that the value of the Mobile Home was in excess of $14,000 at the time of the personal loan contract or that the Mobile Home's fair market value was an integral part of the agreement with Defendant. Plaintiff seemed content with Defendant's representation that the Mobile Home was worth at least $14,000, which is the amount of the personal loan he was extending to Defendant. Similarly, Plaintiff did not prove that the value of the Camry was in excess of $1,000 at the time of the personal loan contract. Therefore, the Court only awards compensatory damages in the principal amount of $15,000.

---

[106] *Mahmood v. Ross*, 990 P.2d 933, 937 (Utah 1999) (quoting *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct. App. 1997)).

b.     *Prejudgment Interest*

Plaintiff makes a request for prejudgment interest of 10% on the compensatory damages from February 21, 2015 through the entry of judgment. Section 523 does not specify a rate of prejudgment interest.[107] As noted by the Tenth Circuit, the purpose of prejudgment interest is "to compensate prevailing parties for the true costs of money damages incurred, and, where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation."[108] Because the Bankruptcy Code does not provide a rate for prejudgment interest, the Tenth Circuit has indicated that it is "appropriate to look to state law 'as a matter of convenience and practicality.'"[109]

Utah Code Ann. § 15-1-1(2) provides that "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah courts hold that the "statutory legal rate of interest is applied from the date payment is due to the judgment date."[110] Furthermore, the "true test of whether pre-judgment interest should be allowed is not whether damages are unliquidated or otherwise, but whether injury and consequent damages are complete and interest can be allowed from the date the injury is suffered."[111] As noted by the Utah District Court, "[t]his standard has

---

[107] *Kim v. Sun*, 535 B.R. 358, 372 (10th Cir. B.A.P. 2015).

[108] *U.S. for Use of C.J.C., Inc. v. Western States Mech. Contractors, Inc.*, 834 F.2d 1533, 1544 (10th Cir. 1987).

[109] *Id.* at 1541 (quoting *U.S. ex rel Ga. Elec. Supply Co. v. U.S. Fidelity and Guar. Co.*, 656 F.2d 993, 997 (5th Cir. 1981)).

[110] *Davies v. Olson*, 746 P.2d 264, 270 (Utah Ct. App. 1987) (citation omitted).

[111] *In re Wardley Corp.*, No. 09-29171, 2012 Bankr. LEXIS 5274, 2012 WL 5467743 (Bankr. D. Utah Nov. 9, 2012) (citing *Fell v. Union Pacific*, 88 P. 1003 (Utah 1907); *Bingham Coal & Lumber v. Board of Education of Jordan School District*, 211 P. 981 (Utah 1922)).

generally been applied as a two prong test: (1) whether the damages are complete and (2) whether they can be measured by fixed rules of evidence and known standards of value."[112]

In this case, the Note lists the principal amount of the loans at $14,000 and $1,000 to be repaid within four months of October 21, 2014. However, the Note does not mention a rate of interest, and there was no evidence of an agreed interest rate.

The Court has found that the Note constituted a valid and legally enforceable contract for repayment. The total loan amounts of $15,000 were "[t]o be paid within four months" of October 21, 2014, which results in a due date of February 21, 2015. Because the parties did not state an interest rate in the Note, the Court will apply a prejudgment interest rate of 10% per annum. This results in an interest accrual of $6,369.86 from February 21, 2015 through January 18, 2019.

### c.    Punitive Damages

The Court declines to award punitive damages. Utah Code Ann. § 78B-8-201(1)(a) provides:

> Except as otherwise provided by statute, punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

The dual purposes of punitive damages under Utah law are:

> [A] punishment of the defendant for particularly grievous injury caused by conduct which is not only wrongful, but which is willful and malicious so that it seems to one's sense of justice that mere recompense for actual loss is inadequate and that the plaintiff should have added compensation; and that the defendant should suffer some additional penalty for that character of wrongful conduct; and also that such

---

[112] *Cop Coal Dev. Co. v. Rushton* (*In re C.W. Mining Co.*), No. 2:10-CV-39TS, 2013 U.S. Dist. LEXIS 11239, 2013 WL 319287 (D. Utah Jan. 28, 2013) (citing *AE, Inc. v. Goodyear Tire and Rubber Co.*, 576 F.3d 1050, 1055 (10th Cir. 2009).

a verdict should serve as a wholesome warning to others not to engage in similar misdoings.[113]

Punitive damages "should be applied with caution lest, engendered by passion or prejudice because of defendant's wrongdoing, the award becomes unrealistic or unreasonable."[114]

Utah Courts consider the following factors when assessing a punitive damage award:

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.[115]

The Court is not persuaded that Defendant's fraudulent conduct regarding the titles caused a "particularly grievous injury" to Plaintiff, or that her conduct was willful and malicious to the extent that compensatory damages are an insufficient remedy. Further, the Court does not believe punitive damages are necessary to deter Defendant's conduct in the future. The award of nondischargeability, coupled with Plaintiff's likely continued collection efforts, should sufficiently deter Defendant from engaging in similar conduct in the future.

## V.    CONCLUSION

The Court finds that Defendant and Plaintiff entered into an enforceable contract for two personal loans: the first on October 21, 2014 for $14,000 secured by title to the Mobile Home title; and the second on or about December 15, 2014 for $1,000 secured by the title to both the Mobile Home and the Camry. The prejudgment interest accrual from the Note's due date of February 21, 2015 through January 18, 2019 at 10% totals $6,369.86. The Court finds that Defendant engaged

---

[113] *Kessler v. Rogers*, 542 P.2d 354, 359 (Utah 1975)

[114] *Id.*

[115] *Crookston v. Fire Ins. Exchange*, 817 P.2d 789 (Utah 1991) (citing *Bundy v. Century Equip. Co.*, 692 P.2d 754, 759 (Utah 1984); *Von Hake v. Thomas*, 705 P.2d 766, 771 (Utah 1985)).

in actual fraud by obtaining duplicate titles to the Vehicles after she had delivered signed copies of the titles to Plaintiff. Thus, the Court finds that Defendant's debt of $21,369.86 owing to Plaintiff is nondischargeable pursuant to § 523(a)(2)(A) for actual fraud.

The Court denies Plaintiff's claims for nondischargeability under § 523(a)(2)(A) for false representation and under § 523(a)(6) for willful and malicious injury for conversion and abuse of process. The Court will enter an order and judgment consistent with this Memorandum Decision.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing MEMORANDUM DECISION FINDING THAT DEFENDANT'S DEBT TO PLAINTIFF IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(2)(A) shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Stephen K. Christiansen steve@skclawfirm.com, jen@skclawfirm.com
- Alejandro Maynez maynez_law@comcast.net, heath@casedriver.com
- Jeremy C. Sink jsink@mbt-law.com
- Nathan P. Williams nathan@williamslawofutah.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None.